Pearson Cloud, Executor, etc., v. Anna Mary Markle and Charles Markle, Appellants. Howard Hawley, Garnishee.

*Judgment—Opening judgment—Evidence.*

An application to open a judgment entered upon a judgment note must under the facts developed in this case be supported by clear, precise and positive testimony, which should not be doubtful in character, and it must establish either that there was fraud, accident or mistake in the creation of the instrument itself, or that there had been an attempt to make a fraudulent use of the instrument in violation of a promise or agreement made at the time the principal contract was made, and without which, it would not have been executed. While a judgment should not be opened, as a general rule, upon defendant's oath alone where he is contradicted by the testimony of the plaintiff, yet where there are corroborative circumstances, or circumstances from which inferences may be drawn corroborating the defendant, it is proper to open a judgment and refer the question to the jury.

On an application to open a judgment it is proper for the court to weigh

the evidence and decide according to the preponderance thereof; and where the court below has refused to open a judgment, the Supreme Court will as a rule determine only whether the discretion of the court below has been abused or improperly exercised.

*Judgment—Opening judgment—Bond—Mortgage—Parol evidence.*

A judgment entered on a judgment bond, given for the purchase of real estate, should be opened, on application, where the evidence for the defendants is clear and precise, and tends to show that at the time the judgment bond and the mortgage which accompanied it were given there was a verbal agreement made between the parties that if the defendants were unable to keep the property they should have the right to rescind the contract, reconvey the title, surrender the possession of the property, and thereupon have the bond and mortgage returned; and that subsequently the defendants, finding themselves unable to pay for the property, moved out and surrendered the key at the request of plaintiff, who advertised the property for sale, leased it and collected the rent.

Argued March 1, 1898. Appeal, No. 37, Jan. T., 1898, by defendants, from order of C. P. Chester Co., April T., 1897, No. 69, discharging rule to open judgment. Before STERRETT, C. J., GREEN, McCOLLUM, DEAN and FELL, JJ. Reversed.

Rule to open judgment.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was in discharging rule to open judgment.

*Wm. M. Hayes*, with him *C. Wesley Talbot*, for appellants.— An application to open a judgment entered on warrant of attorney, or on a judgment note, is addressed to the equitable powers of the court below, and upon an appeal to the Supreme Court under the Act of April 4, 1877, P. L. 53, the question is, whether the court below rightly exercised its discretion upon the evidence : Jenkintown N. B. v. Fulmor, 124 Pa. 337.

While a judgment should not be opened as a general rule upon defendant's oath alone when he is contradicted by the testimony of the plaintiff, yet where there are corroborative circumstances, or circumstances from which inferences may be drawn, corroborating the defendant, it is proper to open the judgment and refer the question to a jury : Wernet's App., 91 Pa. 319; Heimgartner v. Stewart, 180 Pa. 500; Stockwell v. Webster, 160 Pa. 473; Lippincott v. Whitman, 83 Pa. 244;

Greenawalt v. Kohne et al., 85 Pa. 369; Keough v. Leslie, 92 Pa. 424; Caley v. Phila. & Chester County R. R. Co., 80 Pa. 370; Russell v. Glass Works, 6 Pa. Superior Ct. 122; Clinch Valley Coal Co. v. Willing, 180 Pa. 165; Hoöpes v. Beale, 90 Pa. 82; Thomas & Sons v. Loose, 114 Pa. 35.

*R. T. Cornwell*, with him *Wm. C. Alexander, John J. Gheen* and *Gibbons Gray Cornwell*, for appellee.—An appeal to the Supreme Court from the decision of the court below refusing to open the judgment entered upon bond and warrant of attorney is authorized by the Act of May 20, 1891, P. L. 101, Purd. (12th ed.) 789, but the Supreme Court will only determine whether the discretion of the lower court has been abused or improperly exercised: Earley's App., 90 Pa. 321; Hickernell's App., 90 Pa. 328; Wernet's App., 91 Pa. 319; Rand v. King, 134 Pa. 641 ; Kelber v. Plow Co., 146 Pa. 485 ; Pennock v. Kennedy, 153 Pa. 579; Walter v. Fees, 155 Pa. 55; Philadelphia v. Weaver, 155 Pa. 74; Renwick v. Richardson, 5 Pa. Superior Ct. 202; Schiehl's Est., 179 Pa. 308; Phillips v. Meily, 106 Pa. 543; Kostenbader v. Peters, 80 Pa. 438; Jackson v. Payne, 114 Pa. 67; Dixon-Woods Co. v. Glass Co., 169 Pa. 167; Dickson v. Hartman Mfg. Co., 179 Pa. 343; Russell v. Spring City Glass Works, 6 Pa. Superior Ct. 118.

OPINION BY MR. JUSTICE GREEN, July 21, 1898:

This was an application by the defendants in a judgment to have the judgment opened and the defendants let into a defense. The petition set forth the facts upon which the application was based, a rule to show cause was granted, testimony was taken, and after argument in the court below the rule was discharged with a short opinion stating the reasons for the action of the court. After having carefully read and considered the whole of the testimony we have reached a different conclusion, and think the rule should have been made absolute and the whole matter sent to a jury to determine the disputed facts. There can be no controversy as to the law of the case. It is an application to open a judgment upon an allegation that, at the time the judgment bond and mortgage which accompanied it were given, there was a verbal agreement made between the parties that if the defendants were unable to keep the property they

should have the right to rescind the contract, reconvey the title, surrender the possession of the property and thereupon have the bond and mortgage returned. Of course, such an application must be supported by clear, precise and positive testimony, which should not be doubtful in character, and it must establish either that there was fraud, accident or mistake in the creation of the instrument itself, or that there had been an attempt to make a fraudulent use of the instrument in violation of a promise or agreement made at the time the principal contract was made, and without which it would not have been executed: Phillips v. Meily, 106 Pa. 543. And it is also true that, while a judgment should not be opened, as a general rule, upon defendant's oath alone where he is contradicted by the testimony of the plaintiff, yet where there are corroborative circumstances, or circumstances from which inferences may be drawn corroborating the defendant, it is proper to open the judgment, and refer the question to a jury: Stockwell v. Webster, 160 Pa. 473; Clinch Val. Coal Co. v. Willing, 180 Pa. 165; Lippincott v. Whitman, 83 Pa. 244; Thomas v. Loose, 114 Pa. 35; Heiss v. Banister, 176 Pa. 337, and many other cases. It is also held that on an application to open a judgment it is proper for the court to weigh the evidence and decide according to the preponderance thereof: Heimgartner v. Stewart, 180 Pa. 500. It is true also that where the court below has refused to open a judgment the Supreme Court will, as a rule, only determine whether the discretion of the court below has been abused or improperly exercised: Jenkintown N. B. v. Fulmor, 124 Pa. 337; Hunter v. Mahoney, 148 Pa. 232; Earley's Appeal, 90 Pa. 321, and many other cases. We find that we are unable to agree with the learned court below in the conclusion that the testimony failed to sustain Mrs. Markle's allegations. It seems to us that the testimony in support of her averments comes quite up to the standard required by the authorities, and that it establishes another proposition not noticed in the opinion of the court below, viz: that the parties on both sides actually carried out, at least in part, the verbal contract alleged by the defendants to have been made. It will be necessary to recur to the testimony somewhat in detail in order to verify the correctness of our conclusion.

Mrs. Markle, in whose name the transaction was made, after

saying that the plaintiff had offered to sell the property to her and her husband, and that they had said they had no money and could not pay for it, testified: "He said if we could not hold it after we tried all we could, and we could not pay up our interest, they were all willing to take it back. That is the way they sold it to us. It was understood in the family; they had talked it over and considered it. They had had a sale of his father's estate, and G. Pearson Cloud was executor. They had talked it over at supper and she (plaintiff's mother) wanted us to have this little place. It was understood amongst them, and that is the way. . . . By Mr. Hayes: Q. What was understood? A. If we got tired of it or thought we could not hold it they were willing to take it back. . . . Q. If he had not offered the inducements which you say he did, that if you got tired of the property or did not want to keep it they would take it back again . . . . if they had not offered that inducement to you at the time of the purchase of the property, at the time of the contract between you, would you have entered into the contract? A. I would not. Q. Neither you nor your husband? A. We would not."

Charles Markle, being examined, was asked: "Q. You are the husband of Annie M. Markle? A. Yes, sir. Q. Were you present at the time this contract was entered into for the purchase of this property between your wife and Mr. Cloud? A. I was. Q. State what took place that you heard. A. The proposition was when he came over in the evening that he wanted me in the first place to buy the property. I told him I had no money. He said, 'We don't want any money.' He says, 'All we want is the interest.' I says, 'That is something else.' So then he made the proposition to me that he would sell me the little property for $2,500, and he would give me a week to study over the matter. I said I would study over it. When the week was up my daughter went over to where he lived? Q. Was that all that was said at that time? Were the terms stated? A. That he would sell the property for $2,500, and if I did not keep it or could not hold it, they would take it back, if I could not make up the interest."

Ida M. Markle, the daughter, testified as follows: "Q. You are the daughter of Mr. and Mrs. Markle? A. Yes, sir. Q. Were you present when this contract of sale was made

between your parents and Mr. Cloud? A. Yes, sir, I was there in the kitchen. Q. When was it? A. On the first of November, 1893. Q. Can you tell us what took place, what was said at the time the contract was made? A. Mr. Cloud came over there that evening after they had the sale of their real estate that day, and he asked my father if he would buy the little property that belonged to his mother, as she wished us to take it, as it would not be racked around. That was the words that he said. Pap said right away 'Well I don't have any money to pay for it.' He said that did not make any difference at all, just to pay the interest. . . . Q. Just state what was said, not what was the understanding. A. When we said we had no money, he said it would not make any difference, just to pay the interest, and mother spoke and said, 'How much do you want for it?' He said, '$2,500.' She said we could not take it because we had nothing to pay for it that way, and he said, 'You would receive some money from your father after awhile.' She said, 'No, it would be in this property that we was to stand for the grandchildren after her death.' He said, 'Well, then, that did not make any difference.' He said then that any time we found we could not pay for it, and got tired of the place, just to give it back and they would accept it; they would receive it back under those conditions, and that was the understanding between us three, my father, my mother and myself. That was the main understanding. Q. Mr. Cloud was there? A. He came and said that to us and we gave these answers. . . . Q. You said he was to have a week, and you have given us a conversation which you had with Mr. Cloud, but were you present when your father and mother and he finally concluded that they would make the transfer? A. It was that evening we said we would take it that way. . . . That was just the one agreement made between us and there was no other agreement made."

While the plaintiff denies that there was any agreement to take the property back, he corroborates the testimony of the Markles in regard to their saying they had no money, and were not able to buy the property. He said also he consulted with his mother in regard to the matter and she agreed that they might have the property without any money and pay for it when they became possessed of money, as Mrs. Markle had said she would.

The foregoing testimony of the parents and the daughter comes quite up to the standard of our requirements. It is very direct, certain, positive and specific. If believed by the jury, and we know of no reason why it should not be, it would certainly justify the jury in finding that it was a part of the contract of sale that the plaintiff would take the property back if the defendants found they could not pay for it, and desired him to take it. It related to the very time of the contract for the sale of the property, and formed a part of it. It did not alter or change the deed or the bond and mortgage, but tended to prove that the property was to be taken back in the contingency mentioned. It seems to us that the defendants were entitled to be heard before a jury on the main question upon the direct testimony as to what the contract was, but that is not by any means the only testimony in support of the contention of the defendants. They further alleged and testified that the plaintiff subsequently did in part carry out the terms of the parol contract; that, when the defendants, after being in possession nearly two years, told him they were unable to pay for the property or keep up their interest payments, and that they were obliged to give up the property, he finally agreed to take it back, and in pursuance of that agreement he notified them to leave the place and give up possession of it, so that he could lease it to a tenant, all of which he did, and thereupon collected the rents from the new tenant for a whole year.

On this subject there was a considerable amount of testimony, which was without any serious contradiction. Mrs. Markle testified as follows: " Q. Did you subsequently make any arrangements with G. Pearson Cloud about returning to him the property and if so, when? A. We kept it almost two years and found we could not make the rent or interest, as he said it was the same as rent, and we returned it, and he took the place, advertised it and rented it. He told us he had rented the place and we would have to get out. He advertised it for sale or rent, almost two years after that, in February, on the 11th. In January we returned it. February 11, he advertised it for sale or rent and told us the last of February he had rented it, and we would have to get out. He knew we were going, and was satisfied for us to go. We expected to move to Bristol, and he offered to take a load of goods to Malvern for us. After he

told us we should get out, for he had rented it, we rented George Burns's place the next day. He offered to move us there. That is in the same township. He took the place, put a tenant in himself, and that is all I know." After saying that she had seen the advertisement in the paper; that she never authorized it, and that she never made any contract with the new tenant, she was asked: " Q. I understand you paid all your interest upon your obligation up until the time you left the property? A. Yes. He told us if we would pay up the interest he would call it square, and we paid the interest, at least we paid his lawyer.

On the same subject Charles Markle testified. After saying that he moved upon the property after the purchase, he was asked: " Q. You remained there how long? A. Very near two years. Q. At the end of two years what took place between you and Mr. Cloud and your wife, or you and Mr. Cloud in relation to this property? A. It was in the winter time. I went over and told Mr. Cloud I would hold him according to his proposition that they had made with themselves; that I would give up the property; that I was done. I would not have any more to do with it now, as I could not hold it. I says, 'I will pay you all the interest up I owe you, and to get the money I will clean myself out of everything I have got, that I can make up the money.' He says, 'Don't talk that way.' . . . . Q. Was there any effort made by Mr. Cloud to your knowledge to rent the property? A. The first thing I seen it was advertised in the paper for sale or rent. Q. What paper did you see it in? A. The daily local. Q. The advertisement which was read here a moment ago? A. Yes, sir. Q. Did you have any talk with Mr. Cloud as to where you could leave the key of the property? A. The day I moved he asked me where I would leave the key. I told him I could leave it most any place; that I could take it to his house. He said no; there was no use in doing that; just to leave it with James Crosley, and that is the last I had to do with anything about the property."

After speaking of a meeting with Mr. Cloud at the Green Tree, he said: " He came and told us that his lawyer said there was nothing in the papers, that he could take the property back, and I says, 'I can't help that, you have already taken it. You have advertised it for sale or rent, and you have rented it.' And I says, 'Now you want to go back on your proposition.'

So then we staid there and talked awhile, and after a bit he says, 'Well I will tell you what I will do. If you will pay me up all the interest you owe me I will call it square.' Q. Did you pay up the interest? A. I did. . . . Q. To whom did Mr. Cloud rent the property after you vacated it? A. The neighbors told me he rented it to John Byers. He is a person I do not know. Q. It was rented? A. Yes. Q. Did you ever receive any of the rent? A. No, sir. Q. There was no accounting to you for any of the rent? A. No. Q. Did you deed the property back to Mr. Cloud? A. I tendered him and his mother both the deeds, and they did not accept them."

The advertisement was given in evidence, and it was in these words, "For sale or rent—A house and ten acres of ground in East Goshen township, near Dutton's Mill. Apply to G. Pearson Cloud, Cloud, Pa."

Mr. Cloud, when on the witness stand, admitted that he had advertised the property for sale or rent, and that he had rented it to Byers and collected the rent. He also admitted that both Mr. and Mrs. Markle had come to him and told him that they could not keep the property, and could not pay for it, and wanted him to take it, but said that he had declined to take it, because he had no power to do so, and he also denied that he ever agreed to take it back.

Ida M. Markle, the daughter, also testified upon this subject. She said: "He told us we would have to leave. Q. Who told you you would have to leave? A. Mr. Cloud told us we would have to leave the property when he got the tenant. He put the advertisement in the paper and we saw it and he told us we would have to get out and leave the key at Thomas Crosley's, which we did." She gave other testimony to the same effect which it is not necessary to repeat. Samuel Byers testified that he rented the property for his son from Mr. Cloud, and that his son moved in and occupied it for a year. John Byers, the son, testified that his father had rented the property for him, and that he occupied it as tenant for a year and paid the rent to Mr. Cloud.

There was some other corroborating testimony but it does not require repetition. There was some conflicting testimony as to what took place at an interview at Mr. Gheen's office, all of which would be proper for the consideration of a jury but need not be discussed here.

It seems to us that the testimony is of such a character as to fairly raise the question whether the plaintiff was making an improper use of the judgment bond given with the mortgage, in violation of a promise or agreement made at the time the contract was made, and without which it would not have been executed. It is not too much to say that the preponderance of the testimony on this subject is with the defendants. The subsequent acts of the plaintiff in advertising the property for rent or sale, and his actual renting of it and receiving the rents for it, are strong corroborating circumstances in support of the defendants' claim, and they tend also to support the contention as to the fact of the original alleged contract to take the property back. The testimony of the three Markles as to the subsequent acts and declarations of the plaintiff seem to be of preponderating weight, not only as to the actual taking back of the property, but also as to the making of an original agreement to do so. It is to us very clear that all the facts ought to be submitted to the consideration of a jury, and should not be disposed of by discharging the rule to open the judgment. We are of opinion that the assignments of error should all be sustained and so direct.

The judgment of the court below is reversed and the rule to show cause is made absolute, and a procedendo awarded, at the cost of the appellee.